Madam Clerk, will you please call the case on the docket this afternoon? 15-1678, the interest of Nasie M. All right, I'd like for the attorneys to step up to the podium. I want you to tell me your names, who you represent, and approximately how long your argument will take. Good afternoon, Counsel. Hi, Your Honor. Kristen Mueller from the State Appellate Defender's Office, representing the juvenile, Nasie M. I believe I need around 10 minutes, and if I can reserve 5 minutes for rebuttal. Okay, very good. Good morning, Counsel, or good afternoon, Counsel. Your Honor, Lisa Sterba, Assistant State's Attorney on behalf of the people. I don't anticipate needing any more than 15 minutes. Very good. Ms. Mueller, you can proceed with your argument. This case involves three times our system failed a juvenile, Nasie M. First, his due process rights were violated when the State failed to prove each element of the offense beyond a reasonable doubt. Second, his due process rights were violated and the purpose of the Juvenile Court Act when the final day of his sentencing was held without a parent or guardian present. And third, the Juvenile Court Act was again violated when the trial judge sent him to the Department of Juvenile Justice for an indeterminate term without first meeting the express requirements of Section 5-750. As to the first issue, Nasie was found guilty of reckless discharge of a firearm, unlawful possession of a firearm, and aggravated unlawful use of a weapon, all based on the State's theory that he accidentally shot himself in the foot. The first two offenses require proof beyond a reasonable doubt that he possessed a firearm. The last offense requires proof beyond a reasonable doubt that he possessed a handgun. So the State says that this is all about credibility. The judge already made the determination of credibility, believe the detective, and end of story. Well, Your Honor, I don't believe that you have to resolve this based on a credibility finding. The detective was only saying what he believes the juvenile told him in the emergency room. He could very well believe that that's what was said, but the evidence didn't prove out that way. The evidence showed that the detective's theory, this statement, relied on the gun at the girlfriend's house being the gun that was used. He said that Nasie was allegedly shot in a vacant lot and then ran back two blocks to the girlfriend's house and the girlfriend took the gun inside and hid it under a mattress. Well, that gun was a revolver. The evidence technician testified that there was no spent cartridges in that revolver. There was only one live round, a .38 caliber bullet. However, the police officer, Tricia Solis, who responded to the call of a woman with a gun, went to the vacant lot where she found Nasie and the girlfriend. And as her partner questioned them, she found a casing in that vacant lot. Well, that casing was a .9 millimeter casing. So it's inconsistent with the revolver, as Detective Berg admitted, because, A, revolvers don't use casings. It would still be in the chamber in .9 millimeter, not .38 caliber. Was the gun recovered? I'm sorry? The gun in the shooting recovered? Well, we don't know. The revolver that was found at the girlfriend's house was never linked to this shooting. There's no gun residue, gunshot residue, no fingerprints, and there's no medical evidence or any other evidence establishing that his wound on his foot had to be caused by that. So you know that he had a .9 millimeter and a .38 involved in this, two different caliber of guns. Is that right? Possibly. It could be that the revolver wasn't used and it was something else. It could be that this casing was found in the lot from who knows how long ago. But no one saw this juvenile with a gun in his possession? Correct, Your Honor. There was no eyewitness testimony. Was there an eyewitness to him shooting himself in the foot? None presented at trial. Apparently, according to either theory presented, there would have at least been the girlfriend present, but she wasn't called. Her mother wasn't called to ask if the revolver was hers. She lived with her mother. The officer testified about the defendant making a confession or the juvenile confessing to him that he shot himself. Was there any evidence to corroborate the confession? No, Your Honor. His story is that the revolver would have been the gun. So he's saying that, as he said in the hospital right after the shooting, he tells him, as he's highly medicated, that first he tells him that he was chased by two men and they shot him from behind. And then he says, oh, well, we just found a gun at your girlfriend's house. And he changes his story and says, I was holding it in my sleeve and I accidentally shot myself. And then we ran to my girlfriend's house with this gunshot wound on his foot. So you've got a bullet wound self-reflected from the top of his foot. And you've got two bullets in the bottom of his foot while he was running away from somebody? That would be the juvenile's testimony, that while he was running away, he was shot at, and two bullets went into the bottom of his foot. The state's theory is that the shooting went into the top of his foot. No medical evidence? Correct. There was no clothing to show because he said he shot through his coat or sweater. Right. But there were fragments of bullets in his foot? Only according to the juvenile. He believed that there was still something stuck in his foot. Of course, he is a 17-year-old high school student and not a medical doctor. We don't know what was stuck in his foot. But no medical expert testified as to the wounds in the juvenile's foot, correct? Correct, Your Honor. There are no medical experts, not even a firearm expert, nothing. And to get back to your question, to the extent that the revolver was found in the girlfriend's house under that mattress, it would somewhat corroborate that confession if it weren't otherwise inconsistent with the evidence. So there's no gun that's found. The supposed shooter, Nassif, has been given some medication, but he's capable of discussing this with the nurses or with the police? With this detective. The detective. Allegedly, Your Honor. But again, the state's theory is that he shot himself in the top of the foot at close range. But you have no residue studies? There's nothing on anybody's hands or body? Nothing. Did they do a palm print on his hand that would have shown whether a gun had gone off in his hand? No, Your Honor. So where are the forensics in this? Why isn't there any empirical evidence involved in this case? Because the state failed to meet their burden beyond reasonable doubt, proving that that was, in fact, a firearm or a handgun. The revolver was used. They didn't take his clothing in. They didn't perform any testing. They didn't show any stifling. The state had the medical records, and they chose not to use them. Additionally, it's notable that the legislator created this separate offense for discharging rifles on a public street. If these convictions stand, it would be based on pure assumption that a firearm or handgun was used, and that would render this offense discharging air rifles on a public street meaningless. This is something the Supreme Court has already prohibited and people beloyed. In sum, there was not proof beyond reasonable doubt that Nacy's wound had to be caused by a firearm or handgun, and this Court should vacate it outright. If you do not have any alternative, I would also submit that the trial court violated his due process rights and the purpose of the Juvenile Court Act by failing to ensure a parent or guardian was present on the final day of sentencing on his behalf. His mother was present for every single court date except one pretrial date when she was told not to appear, and then she was uncharacteristically absent without any explanation on that final day of sentencing. Within the statute, does it require that the judge wait until a parent appears? It doesn't explicitly require. It doesn't require explicitly or implicitly, does it? I would argue that it does require implicitly to the extent that parents are a party respondent. They have a right to be present at the proceedings. They have a right. They don't have to. That's right, but they have a duty to participate in the assessment and the treatment of the juveniles. But we're not talking about that. We're talking about the court hearing. That would have to do with sentencing, though, Your Honor. So unless the parents are there, your position is that this juvenile cannot be sentenced unless a parent or guardian appears? Yes, Your Honor. I believe that there should be a parent there. Even though it doesn't explicitly, we'd have to read that into the statute, right? You have no cases that support that position. There's no case directly on point with sentencing. There were cases where the parents were present at the trial hearing, the adjudicatory hearing, and they were excluded because of a motion to exclude potential witnesses, which is different than this case because the parents were never present. It wasn't like they showed up and he excluded. But the mother did receive notice that this proceeding was going to take place, correct? Yes, Your Honor. And what's interesting is that she never missed anything. She was present for every court date except one she was told not to appear. And in sentencing under the Juvenile Court Act, especially when they want to send these kids to the DJJ under an indeterminate term, all the considerations that the judge has to make would really require the mother to be present or the guardian or at least a more thorough social investigation report than existed here. Were there other family members present? Well, there was two sisters present, but they're not party respondents under the Act. And the judge didn't even establish if they were adults. The notice doesn't say you have to appear. All that's required under the Act is to give notice. Correct. It doesn't say you must appear. So why should we be reading in that notice words that this legislature decided not to put in? Your Honor, I would assume that you should read into it the obligation to at least inquire into where the mother is in the situation of this case. Just inquire, consider a continuance or appoint a GAL. When the Act puts a duty on the parents to assist in the treatment of the juvenile and the rehabilitation, recognizing and accepting responsibility, all of these things are crucial at sentencing. Also, the Supreme Court decisions have made clear that the value of having a parent present is essential in safeguarding the juvenile's best interests and that this cannot be filled, that role, that duty can't be filled by the defense attorney. The harm caused by the mother's uncharacteristic absence in this case is demonstrated by the third issue I raised, which was the trial court's complete failure to comply with requirements of the Act before sending NACI to the Department of Juvenile Justice under Section 5-750B. That was amended effective January 2012, and it now requires the trial court to receive evidence of efforts to locate less restrictive alternatives to secure confinement and the reasons why those efforts were unsuccessful. The trial court also must find that secure confinement is necessary after reviewing seven factors. Here, the words less restrictive alternatives were not even mentioned until the trial judge announced his ruling sending my client to the juvenile prison. Of those seven factors, the 1D is educational background and whether he was ever assessed for a learning disability. The record reflects that the first court date in this case, the defense attorney revealed that NACI was a special ed student and had an IEP in place. This wasn't even brought out at sentencing. The trial court wasn't given any assessments to review of the minor. He didn't review any community-based services. There was no mention of any group home, counseling, none of the above. Yet still, the trial judge checked all of these boxes on the pre-printed sentencing form, indicating that he had considered these factors. How do you know he hadn't? Because there's no evidence in the record of educational background, of assessments, of community-based services. There's nothing in the social investigation report or the transcript showing that this evidence was before him. Well, if it's not before him, what's a judge supposed to do in that situation? He's supposed to require that evidence, and the act explicitly gives him the right when he's considering sending a juvenile to the DJJ, that he should or he can order a continuance and ask for more evidence and reports. The appellate courts have found, based on even more evidence before the juvenile judge than existed in this case, that the judge still violated the terms. In Rahim M., the trial court similarly checked the box on that form order, and indicated he had evidence of efforts to find a less restrictive alternative, but the record didn't support that. It showed no evidence in the social investigation report or the transcript on efforts. Same as to the boxes for assessment results and community-based services. And in that case, the social investigation report indicated that the juvenile had received treatment in the past, but the appellate court found those centers weren't contacted about whether they could be that less restrictive alternative, and that was a failure, and therefore remanded for resentencing. This court in Henry P. cited to Rahim M., and found that the judge never expressly found that all of the less restrictive alternatives that were presented to him were not sufficient to qualify, were not acceptable for the juvenile. It's the same thing here. And in the Henry P. case, this court said that it would be concerned with the precedential value of its opinion if it found that the trial court must have made the finding required, quote, based solely on its statement that it considered the issue, paragraph 62. It's the same situation in this case, just based on absolutely no evidence before the court. The state argues that this error is forfeited, citing Henri M.W., which held that no post-trial motion is required for juvenile proceedings, but an objection is required. In that case, the court declined to review for plain error because the issue was failure to give notice of an amended petition to a non-custodial father. The evidence was not close there, and the error was shown to not be serious because the mother was present to represent the juvenile. And the juvenile didn't explain how the dad's absence was unfair at that amended petition hearing. Here, there was no parent present, and the evidence was worse than not closely balanced because there was no evidence at all. Additionally, there was no post-sentencing motion, and there wasn't an explicit objection to this here, but just as this court did in Henry P., it considered the error serious and didn't even consider forfeiture at all. Forfeiture is not a limit on this court. It's a limit on the parties. Additionally, in Hugo G., the court didn't consider the lack of an objection when addressing the sentencing challenge. And in Rahim M., the appellate court reversed for plain error. I would argue that this court can also do the same under any of those bases in this case. If there's no other questions. Do you have any questions? Thank you, counsel. Ms. Mueller. Ms. Sterba. May it please the court. My name is Lisa Sterba, assistant state's attorney on behalf of the people. Your honors, the facts of this case pertain to a gunshot wound that the minor sustained to the very top of his foot. The trial court determined that the minor's confession coupled with corroborating circumstantial evidence in the form of a bullet hole squarely on the top of his foot was sufficient to establish the minor's guilt. The trial court also found that the minor's confession in a bullet wound on the top of his foot was in fact a self-inflicted wound. The evidence at trial boiled down to a credibility battle between Detective Berg and the minor. Detective Berg met with the minor immediately following the shooting in the hospital that night. At that point, the minor relayed to Detective Berg two very different stories. Wasn't the minor under some drug influence as a result of the pain he was suffering at the time? Your honor, there's no evidence in the record to indicate or support the claim that he was under any medication other than his self-serving testimony, which the trial court explicitly rejected at trial. But the officer's testimony was based on the information he got from the witness who was not credible, correct? The trial court found that he wasn't credible at trial. Yes, but the same witness who was not credible provided the officer with the information that he used to convict him, correct? That's correct. So he's credible when he provides the officer with information in a hospital, but he's not credible when he testifies in court, correct? The same witness. He wasn't credible at trial, and the initial story that he relayed to Detective Berg was simply incredible, and a fabrication of what really occurred that night. But he gave him two stories. One's credible, one's not credible. That's what you're telling. One story's credible, and it's also corroborated. By what? What evidence do you have to corroborate? By the gunshot wound. Did you present some kind of expert that testified about how the juvenile got that wound? No. There are no forensics at all in this case? No, Your Honor. So what supports this? As Justice Mendoza, what supports this? The trial court made very specific credibility findings and determined that Detective Berg testified credibly and that the minor confessed that he was, in fact, carrying a gun that night, and he had the gun because he wanted it for protection. Counsel, you don't understand that it's your opponent's position that there's no evidence to establish an element of the offense. So rather than tell us what the court found, tell us what evidence the state presented. That's what we want to know. The state presented evidence in the form of a clear confession from the minor that he was, in fact, in possession of a firearm the night of the shooting. Not only was he in possession of a firearm, but common sense dictates that as he's carrying a gun in his hand and shoots top of his foot, shoots straight down as he's running, he shoots himself squarely on the top of his foot. Well, she talks about two different types of guns. She said he had a revolver. That's the gun that they found at the house, correct? Correct. And you found some shells out at the scene where this allegedly occurred, and the revolver, according to what she says, doesn't eject the shells. Is that correct? That's correct. So then how does that gun corroborate the testimony of this witness who's not credible? The gun is not what corroborates the testimony. Okay. What is it? The gun is not what corroborates the bullet wound. Did nobody testify about it? Detective Berg testified that he closely examined the nature of the wound. Is he an expert on gunshot wounds? No, he's not. Was he qualified as an expert? No. So why didn't he rely on what he said? He testified as to his observations of the injury that night. How does he know it wasn't a BB shot? Because the minor confessed that he was carrying a gun and shot himself in the foot. The minor confessed after the detective told him they found a gun in his girlfriend's apartment? That's correct. Which turns out that gun that they found could not have been the gun in this case, correct? Correct. But the gun that was found at his girlfriend's house isn't required here. Is it true that nobody ever saw this minor who responded with a gun? That's true. Okay. No evidence of that. But that's an element of the offense, correct? That's correct. And the minor not only admitted to carrying a gun on the night of the shooting, but he also admitted it numerous times at trial. The minor repeatedly refers to the injury he sustained that night as a gunshot wound. The prosecutor very specifically and very clearly asked him, what did you hear from behind you? What was the noise that you heard from behind? But the judge found he was incredible. I'm sorry? Didn't the judge say he was an incredible witness? The judge did find that he was incredible. So which part did he believe and which part did he not believe? We believe that he did, in fact, sustain a gunshot wound that night. And the record is replete with evidence supporting that. Nowhere in the trial court was the issue ever raised as to whether or not he sustained a gunshot wound. And the trial judge indicated the same. He indicated that there's no dispute here as to whether there was a gun use and whether the minor has a bullet wound on his foot. The prosecutor proceeded to ask the minor, do you still have bullet fragments in your foot? The minor said, yeah. He never had any surgery or any operation to remove those bullet fragments which were lodged in his foot. But that doesn't show that that was a firearm that he had. Because you have a firearm. Right. So is a charging instrument a UUAW? I'm sorry? An unlawfully usable weapons charge? Is that the charging instrument in this case? Correct. So you have to find a weapon in order to have that found to be a UUAW? A weapon is not required here, Your Honor. What we have here is confession coupled with very strong corroborating circumstantial evidence in that he, number one, admitted to carrying a gun. Whether or not it was the gun that was required is certainly a different story. But he admitted to possessing. Who's here to testify to that? There's no forensics from the state. And there's no gun. The only gun that shows up is at the very end of the girlfriend's house on the bed. That's correct. And it's a revolver. And so when you talk about casings, the casings would have come from a semi-automatic pistol based upon the ejection of it, which is discussed in your briefs, as opposed to having it lodged inside the revolver cylinder after firing. There's also no claim and no proof that the shell casing that was found at the scene, as counsel indicated, was associated with the shooting that took place this night. That could have been from any number of shootings that occurred in that area at any time preceding this exact shooting. Under that theory, you only have one choice or one chance to get it, and that's through the use of the revolver. That's your only evidence. The revolver found establishes that the minor admitted he was carrying that gun that night. He gave it to his girlfriend once they got back to her house. So that alone establishes that he was, in fact, carrying a gun. He was possessing a firearm, which he was clearly unauthorized to do. That alone establishes that he had unlawful possession of a firearm. The only time he said that was when he was in the hospital. So either he believed his hospital testimony or he didn't even believe his trial testimony. The court decided to believe his hospital testimony. This had been shot and was taken to the hospital. That's right. The trial judge made very specific credibility findings in this case, and the trial court was certainly in a more superior position  and the trial court specifically found that the minor lied. His testimony was not credible and was not believable. But the officer didn't lie when he said they found a gun. I mean, they found a gun, but it wasn't a gun used here. Not necessarily. Not necessarily. You know it wasn't a gun used here, right? Sure. Couldn't be. So when the officer lied to him and said we got the gun? The officer did not lie. And the trial judge specifically said in his ruling that he wasn't sure a gun was even necessary here to make such findings. He said it wasn't 100% sold on the store. And whether that was the gun that was used. And whether that was the gun actually used. Correct. And aren't we in the same position today as it was the day that he said this? What do we know? What do we know? We know that the minor told Detective Berg that he shot himself in the foot. And we know that Detective Berg was in the hospital the night of the shooting and had made firsthand observations of the injury sustained. He testified that there was absolutely no evidence of any damage done to the bottom of the minor's foot. He only saw a bullet hole wound on the top of his foot. And the trial judge even stated that the pictures that were presented by the defense were blurry and essentially of no evidentiary value at all. So there was nothing to support a claim that he sustained two gunshots to the bottom of his foot. It's incredible to think that as he's running away, allegedly, from two African American males that jumped out of bushes and shot at him from behind, that he was struck not once but twice in the bottom of his foot. And when Detective Berg confronted him that there was something missing from his story, he switched gears and conveyed a more logical and a more truthful version of what happened that night. Viewing that evidence, the minor's confession, the bullet wound itself, and the light most favorable to the prosecution, a rational trial fact could have found, and did in fact find, that the elements of the offense's charge were proved beyond a reasonable doubt. And the minor offers no reason to disturb the findings of the trial court at this point. Turning to the second issue, as a preliminary matter, I want to emphasize that this is a completely forfeited issue and is up before this court for plain air review. The minor only challenges this issue under second-pronged plain air, and what happened here certainly does not rise to the level of a structural error, but I will address the issue at this time. This issue presents a question of statutory construction, and the black-letter law indicates that we examine the plain and ordinary meaning of language included in the text. The only relevant requirement in this case was notice that was due to the minor's mother. The minor was entitled to notice of the minor's delinquency proceedings, and she did in fact receive such notice. She had actual notice of the first day of sentencing and the second day of sentencing. In fact, notice is not even disputed on appeal at this point. After the first day of the dispositional hearing, the trial judge said to the minor's mother, We'll see you back here in two weeks. The minor's mother said, Okay, thank you, judge. At that point she acknowledged that she was aware of the upcoming court date and acknowledged that she would be there. Two weeks later, the second day of sentencing arrives, and the mother doesn't show up. She certainly had a right to be there, but that right was waived when she voluntarily chose not to appear that day. Did the sister show up? They had been there for other events, for other hearings. I'm sorry? The sisters, did they show up at all? He did have two sisters, and he was present on the second day of the dispositional hearing. His mother was present on nearly each and every court date. And the sisters too? Most of them they were. He had a relative present on each and every court date. And on that second court date, it's important to distinguish what happened from the first day of sentencing to the second day. On the first day, the mother was present in court, and it was on that day that all substantial arguments in mitigation and aggravation were presented. The only reason why this matter was continued for a second day of hearing on the minor's disposition was so that the parties could conduct further legal research on a single legal issue as to whether the minor was to be sentenced as a Class II or a Class IV. Considering that the mother was there at almost every hearing in the case, wouldn't it be a better practice for the court to inquire as to where the brother was, particularly since she had indicated two weeks before that she knew and she would see him at that time? It may be good practice to do that, but as it stands today, that's not the law, and that's not a requirement included in the Juvenile Court Act. But it would have eliminated this problem if he had simply continued the hearing so the mother could be present. It may have eliminated this problem, Your Honor, but neither the minor nor defense counsel nor the sisters or the niece that were in court ever raised an issue. None of them ever objected to proceeding. Defense counsel never objected. But the burden is on the judge or the court to ensure that a respondent in these proceedings gets all the processes due. That responsibility rests with the court. And the minor received such process in this case. The trial court was under absolutely no affirmative duty to inquire as to the mother's whereabouts. In fact, the second day he did ask if the mother was going to be there. The sister said no. That was even going above and beyond what he was obligated to do. He was under no obligation to inquire any further at that point. And neither the mother clearly sent no message with the sisters or the niece or defense counsel to then relay to the judge, as she certainly could have done. There was nothing preventing her from appearing in court that day. She had the notice that she was owed and simply failed to appear. And the minor cites absolutely no case law, which stands for the proposition that a parent is required before a judge can impose sentence at a dispositional hearing. Nor does the minor cite any case law that stands for the proposition that a trial court is under any obligation to sua sponte postpone proceedings until a parent decides to show up. The minor is essentially inviting this court to rewrite the Juvenile Court Act to insert this type of requirement, which is improper. And had the legislature wanted to include this type of requirement, it certainly would have done so. Turning to the third issue with regards to the minor's disposition, let me emphasize the fact that this is the minor's third time in the Department of Corrections. The trial court had broad discretion to impose commitment as a proper dispositional alternative. In doing so, it was not an abuse of discretion here. The argument is that there were boxes that were checked in which there was no evidence presented or no recognition that the judge had seen that would allow the judge to consider those particular factors. So the judge is checking off boxes of factors that couldn't be considered because they weren't presented. The record reflects that the judge did in fact consider all relevant statutory factors prior to imposing commitment as a minor's sentence. If it doesn't have to be something presented, can you already consider a factor? Say education. If you don't present anything about education, what's there to consider? Defense counsel and the prosecutor each advanced arguments in aggravation and mitigation. And part of defense counsel's mitigating arguments were with regard to the certificates that the minor had been receiving since he had been in juvie. There was certainly plenty of evidence before the trial judge. He considered the minor's substantial background, which considered of now three Department of Correction commitments based on an armed robbery, another gun charge, and an unlawful use of a weapon. But it's your position that counsel says there were some boxes checked off in which there was no evidence presented or discussion? You're saying there was? That the judge had something to consider for every box that was checked off? That's my position, Your Honor. And would your position change if it turned out that one of the factors, there was nothing presented, but it was checked off? Does that make a difference? That's not the claim here, Your Honor. Your Honor, the claim is that he didn't consider these factors that were listed on the order. Well, if there's no evidence of a factor, it could be considered, even though he checked it off. But there was evidence presented. I understand. So if it turns out there was a factor that there was no evidence presented, then you should lose. We shouldn't lose because the Juvenile Court Act and the specific section that counsel cites doesn't specifically state that the trial judge must expressly enumerate each specific finding. But by checking that box, the court is stating that I saw something. Isn't that true? That's true. And if the court did not see anything or consider anything, I mean, if nothing's presented and there's nothing in the record, how could it be considered? Well, that may be true, but that's not what's before us right now. That's not the issue that's before this court because the trial judge did have evidence relating to each and every box that was checked off. As I had stated, he considered the substantial background. This might only have been in Judy 12 times prior. He had four referrals to the Department of Juvenile Justice, including three findings of delinquency and one probation violation. The trial judge also considered the social investigation report in which the probation officer indicated that this minor did have an opportunity at one point for intensive probation, which would have been a lesser restrictive alternative, but the minor wasn't in compliance because he had violated his electronic monitoring and therefore wasn't eligible for an interview. Probation. Is he on an indeterminate sentence now? Yes. And the probation officer actually made a specific recommendation that this specific minor receive commitment to the Juvenile Justice Department based on his failure at rehabilitation. Well, is it true, according to the respondent, with regard to his mother's being unfit or unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the minor, of that particular factor, the trial court findings were that the mother was unfit and that the only evidence was in the SIR and that indicated the mother was not having any problems with her son obeying curfew. So if that was the only evidence, how can the judge make that kind of conclusion? I think the nature of this case makes clear and makes quite evident that the mother is unfit to care for, train, discipline, and support this child, this minor. Why is that? Since 2012, like I said, this is his third time in the Department of Corrections and his run-ins with the law have only become more serious and more frequent since that time. This run-in with the law, apparently he may or may not have shot himself. It's the state's position that he did shoot himself and it was a self-inflicted wound, that he quite literally shot himself in the foot and confessed to doing so at trial. The minor has clearly, and in that the trial court made that specific finding and found that that was the case, that the minor did shoot himself, he's clearly become a danger to himself and to the public at large. So putting him in detention, that's because he's a danger to himself? And to the public and the rest of society, who's subject to him carrying a weapon and shooting it in the middle of the street. In addition to that, his defense counsel at that second day when the sentence was imposed never objected or never raised an issue as to the sentence, the imposition of commitment being the order that day. But there's no claim of ineffective counsel assistance? That's correct. There's no claim of ineffective assistance counsel on appeal as to any of the issues, specifically the second issue with regards to the Juvenile Court Act and the statute or with regards to the sentence that was imposed. Why don't you bring your argument to a conclusion, Ms. Sterpa? If there are no further questions, we would ask that for these reasons and for those stated in our brief that you affirm the minor's convictions and sentence. Thank you, Ms. Sterpa. Ms. Mueller, some brief rebuttal? Thank you, Your Honor. As to the first issue, there is no evidence that this was a bullet hole. It could have been a global projectile from an air rifle or a BB gun. It also doesn't matter that- That is a testimony. We have the-I've written this account of the detective. He said it was a bullet hole. And he said that the respondent said it was a bullet hole. And we have the respondent saying he carried a gun. I mean, if you take the case as presented, then haven't they shown that he was carrying a firearm? I respectfully disagree, Your Honor. First of all, the detective did not testify that he closely examined the wound as the state just represented. He merely said that when he walked into the juvenile's hospital room, he saw the gunshot wound on the top of the foot, and that is when he decided for himself that at least he had shot himself. He's not a medical expert. He's not a firearm expert. And that is not proof beyond a reasonable doubt that a firearm or handgun was used. It also is irrelevant if the word gunshot wound was used because BB guns, pellet guns, it's all guns. It's just if they qualify as a firearm or handgun, and those do not in this case. But if there are fragments of bullets in his foot, that's definitely caused by a projectile. It could be, Your Honor, and if it is caused by a projectile, then it would not qualify for any of the offenses he was charged with. It would have to be from a firearm or handgun to sustain his conviction. And there's simply not proof beyond a reasonable doubt, whether it was one way or the other. Again, the juvenile is not a medical expert. He's a 17-year-old high school kid from the south side of Chicago. He doesn't know what was in his foot. The state had the medical records. They didn't use them. There's no support for the state's claim that there's no weapon required for these charges. The state doesn't cite any support for that, and this is an element of the offense. There's nothing in the evidence to infer that this was a firearm or handgun. Well, I guess you would infer it if you believe his so-called confession to the detective. If you did, Your Honor, it would be contrary to the evidence that the evidence technician collected from that house, which was that revolver with one live round in it, no spent cartridges. And there's no evidence that it was otherwise the gun that was used. So it's not consistent with what the detective says the minor told him in the hospital. Well, he was highly medicated. Well, where was the evidence that he was highly medicated? Juvenile testified at length about how drugged up he felt. But the court didn't believe his testimony. That he was highly medicated? I don't believe that the court specifically found on that point. And, frankly, it's contrary to the universal human experience laws of nature to believe that in this situation, if he really was shot with this firearm or revolver, that he wouldn't have been given pain medication at the hospital. We don't know what time. We don't know how much. We don't know. We don't know how long he may have had it in the system. So he may have been perfectly able to answer the detective's question. I respectfully disagree, Your Honor. I don't believe anybody would be capably able to answer questions under those circumstances. Does that mean the police weren't saying what his condition was, if he wasn't? The officer said he didn't know if he was given medication or not. And merely because the trial court accepted this detective's testimony or made inferences from it, doesn't guarantee that it's reasonable. And the Illinois Supreme Court in Smith said that this court can reverse where it finds this evidence, even though the trial court accepted it, to be unreasonable, improbable, or unsatisfactory. I would submit in this case that this simply was not proof beyond a reasonable doubt. As to the second issue, just to clarify, the trial court did not ask the parties who were present on that final day if the mother was going to be there. He simply asked the sisters if they were the mother, and then he moved on. And yes, there is no explicit requirement in the act that the judge do what I'm asking for, but the Juvenile Court Act, via its amendments, and the Supreme Court and its decisions, have made clear of the level of importance they're putting on the parental presence and parental participation. I don't think it's too much to ask in this case, or in a situation like this, that the trial court, who is charged with conducting and ruling over the hearings before him, simply ask what is going on and if a GAL should be appointed. And as to the final issue, the state's argument is based completely on the minor's background. This is completely contrary to what the Juvenile Court Act requires. There are several factors that must be considered. It would be impossible for that to have occurred here. Were there certain factors in which there was no evidence presented? Yes, Your Honor. But we just heard the opposite. So which ones do you say there was nothing in the record? There was absolutely nothing in the record on any assessments, reviewed any assessments of the juvenile. And this is exactly what occurred in, I believe it was, Rahim M., where they noted that he checked that box for reviewing assessments, and he checked the box for community-based services, but there was nothing in the social investigation report, the transcripts, on any assessments. The same thing happened here. There's nothing. There's no group home mention, no counseling, nothing. Juvenile centers, youth groups, nothing. You simply cannot, there's nothing to support what the state is arguing to here. There's also nothing showing that the mother was unfit. Again, the state is only arguing based on the background, and the Act instructs that there's so many other factors that must be considered. And also, as to the extent whether the defense attorney was ineffective, I can't raise that argument here because I can't show prejudice. I don't know what these other things would have shown. But it's important to note that the juvenile doesn't have an opportunity to file a post-conviction petition. So the better remedy is to, if you don't reverse these convictions outright, just remand for a new sentencing hearing with instructions that all this evidence be sought out. Any questions? No. Thank you. Thank you. Ms. Mooloo, Ms. Sterba, I want to compliment the two of you on your arguments, on your briefs. This court's given you 45 minutes. We enjoyed those arguments, and this matter will be taken under advisement. The court stands in recess.